UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| v. | ) <br> )    CRIM. NO. 2:17-CR-102-DBH |
| MICHAEL ARTIS AND <br> CUWAN MERRITT, | ) <br> ) <br> ) |
| DEFENDANTS | ) |

**ORDER ON MOTION FOR CLARIFICATION OF SUPPRESSION ORDER**

In a bench ruling, I previously denied the defendants' motions to suppress after conducting an evidentiary hearing. I concluded that law enforcement agents had reasonable and articulable suspicion sufficient to justify a Terry stop of the vehicle in which the defendants were passengers, and that the defendants were arrested after probable cause developed through a succeeding drug dog sniff and other observations. Oral Order (ECF No. 55). The defendants have asked me now to confirm that, for purposes of appeal, they adequately preserved a de facto arrest argument—*i.e.*, that they were actually *arrested*, not merely detained, at the outset of the stop. Mot. for Clarification (ECF No. 89); Mot. Joined (ECF No. 90).

It was not apparent from the legal memoranda filed before the evidentiary hearing that the defendants were making such an argument. Instead their written legal arguments focused on the reliability of the information law enforcement had obtained from confidential informants and argued that it was

not enough to justify a Terry stop of the vehicle in the first place. They also argued there was not probable cause for an arrest *after* the detention and dog sniff. But at the beginning of the evidentiary hearing, the defendants' lawyers asked me to pay particular attention to a video of the defendants' encounter with law enforcement during the stop, asking me to view it after the testimony was complete.

I watched the video and at the later oral argument, I questioned defense counsel about what it was they especially wanted me to observe in the video. They argued that the intrusiveness of what took place required law enforcement to meet the higher standard of probable cause, not just Terry's reasonable and articulable suspicion for a stop. In response, the Assistant United States Attorney expressed doubt that the defendants had previously raised a de facto arrest issue (the defendants' lawyers actually never used the term "de facto arrest"), but agreed that as of then the defendants were making that argument and asked for an opportunity of further briefing if I were inclined to entertain the de facto arrest issue. Thereafter (and without further briefing), I ruled from the bench that a Terry stop, not an arrest, occurred initially, and that the arrests occurred later, after the positive canine alerts.

Tragically and unexpectedly, the defendant Artis's lawyer subsequently died, and the Court appointed new counsel to represent that defendant. At her request I approved the preparation of a transcript of the suppression hearing, the argument, and bench ruling. Upon reviewing it, she became concerned whether the de facto arrest had been sufficiently raised for appeal purposes and at her request I conducted a conference of counsel. Thereafter both defendants

2

filed "motions for clarification regarding arguments presented and considered on the motions to suppress," the government filed a response (ECF No. 92), and the defendants filed reply memoranda (ECF Nos. 95, 96). Only in the latter two sets of filings did the parties address caselaw on what it takes to convert a Terry stop into a de facto arrest.

Having now read that caselaw and in particular United States v. Jones, 700 F.3d 615 (1st Cir. 2012), United States v. Chaney, 647 F.3d 401 (1st Cir. 2011), United States v. Fornia-Castillo, 408 F.3d 52 (1st Cir. 2005), and United States v. Acosta-Colon, 157 F.3d 9 (1st Cir. 1998), I conclude that in my original ruling, I did not fully appreciate the nature of the de facto arrest argument as it has now developed. I **REAFFIRM** my original ruling that there were sufficient grounds for an initial Terry stop of the vehicle. Moreover, a canine and his Trooper handler were quickly on the scene, there was no delay, and the dog alerted to drugs on both defendants. But before the dog sniff, the video reveals that several law enforcement agents approached the stopped vehicle on the side of the highway, at least one agent standing behind the car with his gun drawn. Two agents on the driver's side of the car became agitated when the passengers did not at first unlock the doors or windows. One agent was about to use an instrument to break a window when the vehicle was finally unlocked. The agents shouted at the occupants to raise their hands and to place their hands on their heads. One defendant was pulled from the driver's side of the car and around to the rear of the car, handcuffed and patted down while still standing. The other was taken to the ground from the other side of the car and cuffed and patted down on the ground before the agents eventually stood him up.

3

So was that a de facto arrest? "Where an investigatory stop is justified at its inception, it will generally not morph into a de facto arrest as long as 'the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop.'" Chaney, 647 F.3d at 409 (citation omitted). "[A]ssessment of whether the agents exceeded the permissible scope of intrusion is a difficult, fact-intensive inquiry." Jones, 700 F.3d at 624. The detention here was very short (about six minutes) until the dog sniff, which furnished probable cause to arrest, began. Brevity is important. United States v. Sharpe, 470 U.S. 675, 685 (1985); Chaney, 647 F.3d at 410; 4 LaFave, Search & Seizure § 9.2(f) (5th ed.). And Jones says that "measures such as the use of handcuffs, drawn weapons, placing suspects face down on the ground, the presence of multiple officers, and police cruisers positioned to block exits, do not necessarily turn a stop into a de facto arrest." Jones, 700 F.3d at 625 (footnotes omitted); accord Acosta-Colon, 157 F.3d at 18, ("[T]he use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a de facto arrest."); Fornia-Castillo, 408 F.3d at 64 ("[N]either the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a de facto arrest.").

But at the same time, "to say that the use of physical restraints is not necessarily inconsistent with a Terry-type stop does not imply that law enforcement authorities, acting on less than probable cause, may handcuff suspects as a matter of routine." Acosta-Colon, 157 F.3d at 18. The "government bears the burden of proving that the seizure was sufficiently limited in its nature

4

and duration to satisfy the conditions of a Terry-type investigative stop," id. at 14, and "the requisite justification cannot rest upon bald assertions . . . that law enforcement officers were in fact prompted to act" on reasons of safety and security. Id. at 17. The government "must be able to point to *some* specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm." Id. at 19. "[H]ighly generalized statements are inadequate" to establish "actual safety concerns arising from the stop." Id.

Here, the government has argued that "[t]he officers were investigating out-of-state drug traffickers who were allegedly coming to Maine to sell narcotics. The link between firearms and drug traffickers is well and long established. The targets involved were unknown and potentially dangerous. Officers were permitted to take reasonable precautionary measures under the circumstances." Gov't Resp. 4. At oral argument the government's lawyer noted "the protection of possible evidence" as another justification for the officers' approach to the stop. I am concerned whether these assertions by counsel in the absence of testimony meet the Acosta-Colon standard.[1] It has not escaped me that law enforcement stopped the car around midnight on the side of the road after it exited the Maine Turnpike at the Auburn exit, and that law enforcement agents had placed two confidential informants in the precarious position of driving to Boston to pick up an unknown male (as it turned out, two males appeared) at

---

[1] The government's law enforcement witness testified that the defendants were put in cuffs "for safety," but did not elaborate on the safety concerns.

5

South Station and bring crack cocaine back to Auburn to sell. But the record at this point does not reveal whether factors such as these in fact generated the nature of the takedown or whether the video merely shows what law enforcement agents do routinely. So in order to address the defendants' de facto arrest argument now that it has become focused, it may be necessary to reopen the evidentiary hearing in order to determine whether the government can meet the Acosta-Colon standard.

The Clerk's Office shall schedule a conference of counsel to determine how to proceed.

**SO ORDERED.**

**DATED THIS 11TH DAY OF MAY, 2018**

/S/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**