# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>MICHAEL ARTIS AND )<br>CUWAN MERRITT, )<br>)<br>DEFENDANTS ) | CRIM. NO. 2:17-CR-102-DBH |

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR CLARIFICATION OF ORAL ORDER DENYING MOTION TO SUPPRESS

After an evidentiary hearing and a bench ruling denying the defendants' motions to suppress everything resulting from a vehicle stop at Exit 75 of the Maine Turnpike, I allowed a limited revisitation of the matter for reasons I described in my Orders of May 11 and May 25, 2018. Further briefing has now taken place, I have re-read the transcript of the hearing and re-examined the exhibits. As a result, I issue this new decision to replace my bench ruling of December 21, 2017.

The evidentiary record is the following. Three people testified at the evidentiary hearing: Agent David Madore, at the relevant time a task force officer with the DEA; Confidential Informant 1 (CI1); and Confidential Informant 2 (CI2). I have no reason to discredit Agent Madore's testimony. He was careful in his statements and credible. CI1 did not contradict Agent Madore's testimony and, to the degree there was any inconsistency, I find that it was based on CI1's uncertainty about what he expressed to Agent Madore at the time in question, as opposed to what he was thinking in his own mind. As it turned out, CI2 had

1

no relevant information to provide. A number of exhibits also were admitted, among them video recordings of the Turnpike exit stop that resulted in the arrest of the two defendants.

## FACTS

On May 12, 2017, Agent Madore received a phone call from CI1. Tr. 9 (ECF Nos. 83-84). Madore had been using CI1 since February, id., and CI1 had provided reliable information that had resulted in drug-related arrests. Tr. 12, Gov't Ex. 4.[1] CI1 also had a criminal history involving illegal drug possession, driving convictions, bail violations, assault, and burglary among other things. Tr. 9; Gov't Ex. 1. Madore paid CI1 for his information depending on the results. Tr. 58.[2]

CI1 told Madore on this phone call that a crack dealer had called him from out of state and wanted a ride at 7:30 pm from Boston's South Station to Lewiston, Maine to bring a load of crack. Tr. 13-14. CI1 told Madore that he was unsure who the caller was, Tr. 90, but that it might be Mayo, a black male, Tr. 13, of whom CI1 was aware because his addicted cousin had interacted with him. Tr. 33-34, 90.[3] Madore was also aware, through surveillance, of Mayo as an out-of-state drug seller in Lewiston. Tr. 29-30.

Madore and CI1 had further communications that day by phone, text, or in person. Tr. 33. At Madore's request, CI1 agreed to go to Boston to pick up

---

[1] It appears from Gov't Ex. 4 that the convictions resulting from this information did not occur until August and October 2017, i.e., after the events relevant here.
[2] CI1 was paid about $1,000 from February to June, and received about $300 for this case. Gov't Ex. 1.
[3] I had earlier believed that there was no information about race known to either CI1 or Madore at that time, which defense counsel confirmed at oral argument, Tr. 133, but re-reading the transcript shows me that CI1 did identify Mayo as a black male. The caller's race is largely irrelevant to the analysis, see infra note 11.

2

the caller. Because CI1 did not have a valid driver's license, Madore arranged for CI2, not previously known to CI1, to do the driving. Tr. 14-15. CI1 supplied his ex-wife's vehicle for the trip. Tr. 15, 100. CI1 told Madore that the caller told him that he would receive drugs (be "hooked up") in exchange for the transportation. Tr. 36, 54, 93.

The two confidential informants headed south to Boston around 5:30 or 6:00 pm. Tr. 15. Madore was concerned about the safety of the two informants for the trip, given the lack of law enforcement attendance. Tr. 37. Madore told CI1 to relay information to him by phone or text.

Upon arriving at South Station, CI1 informed Madore that the "target" was running late. Madore gave the two informants the option of returning to Maine then or waiting for the delayed target. They waited. Tr. 37.

CI1 reported to Madore that the target arrived after 10 pm, but that there was a second black male as well, and no Mayo. Tr. 16, 94-95. Some of this information was conveyed during a phone call from a gas station where they stopped after leaving South Station, some of it by text. Tr. 38-39, 95. At Madore's request, CI1 texted him as the vehicle carrying the four people reached New Hampshire, then Maine, then various mile markers on the trip through Maine. Tr. 17. Madore informed CI1 that he would have law enforcement on the highway waiting for the vehicle to come through. Id.

Madore had arranged for a traffic stop at Exit 75 of the Maine Turnpike, the exit the vehicle was taking. The videos reveal that there were at least four police cars and eight officers. There was also a state trooper with a drug-detecting dog waiting.

Sometime after midnight, the vehicle was pulled over. Law enforcement forcibly extricated the two defendants from the back seat of the vehicle and patted them down for weapons. Gov't Ex. 2. The drug dog did not sniff the vehicle's exterior for drugs. Tr. 75. Instead the dog's handler had a law enforcement agent stand next to the two defendants in front of the vehicle, and then had the dog sniff each of the three. The evidence does not reveal whether the dog's nose actually touched the two defendants, but the sniff was intrusive. According to the trooper's report, he walked the dog around the defendants and then manually directed the dog's attention ("targeting") up the defendants' bodies from their feet to their pants pockets; the dog sniffed one defendant's crotch area and the other's front pocket area. Defs.' Ex. 2. The dog alerted on both defendants but not on the law enforcement officer standing next to them.

Law enforcement then searched the defendants and discovered crack on Artis, but not on Merritt. Tr. 19-20. Artis was immediately arrested, Tr. 21, and Merritt not long thereafter. (A state warrantless arrest warrant that Madore prepared says that Merritt was arrested at 1:00 am. Gov't Ex. 3.) Law enforcement took Merritt to the Androscoggin County Jail for a more thorough search. There, corrections officers discovered a plastic sandwich baggie partially hanging out of his rectum. Id. They next took him to a hospital to remove the item. Tr. 23. At the hospital there was no discovery of drugs in his rectum, but there is a video of Merritt approaching the emergency room entrance with law enforcement and a package dropping to the ground. About 30 minutes later, an ambulance attendant saw a baggie containing crack cocaine on the ground,

4

retrieved it, and took it into the hospital.  Gov't Ex. 3.  Merritt was "cleared for incarceration" after his hospital exam.  Defs.' Ex. 5 ¶ 18.

**ANALYSIS**[4]

I concluded in my December 21, 2017, bench ruling that Agent Madore had a reasonable and articulable suspicion of illegal drug trafficking to justify a Terry[5] stop and that he did not need the higher standard of probable cause to stop the vehicle.  At that time, the defendants had not focused on the justification for the subsequent dog sniff, only whether the stop of the vehicle was justified.  Since then, I have permitted them to amplify their argument that a de facto arrest occurred upon the stop, thereby requiring probable cause, and I now revisit my earlier treatment of the dog sniff as simply a permitted Caballes sniff.  (In Illinois v. Caballes, 543 U.S. 405 (2005), the Supreme Court found that a dog sniff of a vehicle exterior during a traffic stop was not a search.)

Unlike before, I find now that the situation here does not fit clearly within Terry and/or Caballes.  Law enforcement did pat down both defendants for weapons, something that Terry permits, see Ybarra v. Illinois, 444 U.S. 85 (1979),

---

[4] I focus my attention on the information available to Madore at the time of the stop, because that is the test for whether he had probable cause.  The defendants' examination of CI1 explored *his* basis for believing that he was being asked to transport drugs, that he would receive drugs in exchange, and who the caller was, but my concern is with what Madore knew.  Some other information that came out at the hearing could help or hurt the defendants' case, but it is not relevant to my analysis because it was not known to Madore at the time of the stop (*e.g.*, that the caller told CI1 that his name was Michael—as it turns out the first name of the defendant Artis—or that when Madore called the caller's number after the stop, one of Artis's cell phones rang, or that after the stop CI1 told Madore that on the trip north he heard the two defendants talk, saying they were going to Lewiston to "trap" (a term for selling drugs), and would "hook him up," Tr. 54, or that on the early calls the caller had asked for a place to stay in Lewiston and sell drugs, Tr. 93 (apparently not revealed to Madore before the stop), whether the caller actually used the words "crack" or "drugs" during the phone calls or whether that was CI1's inference from the circumstances of the calls, and when the defendant Artis told law enforcement that his name was "John Doe").

[5] Terry v. Ohio, 392 U.S. 1 (1968).

and <u>Adams v. Williams</u>, 407 U.S. 143 (1972). But the dog sniff that followed had nothing to do with weapons. Nor was it merely an exterior sniff of the car such as the Supreme Court has approved in cases like <u>Caballes</u>.[6]

As far as I can determine, the Supreme Court has never addressed the kind of intrusive sniff that occurred here. Instead, it has said that "[t]he fact that officers walk a narcotics-detection dog around the exterior of each car [at a checkpoint] does not transform the seizure into a search," and that "a sniff by a dog that simply walks around a car is 'much less intrusive than a typical search.'" <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 40 (2000) (quoting <u>United States v. Place</u>, 462 U.S. 696, 707 (1983)). The Supreme Court did use broad language in <u>Caballes</u>, saying that "governmental conduct that only reveals the possession of contraband [*i.e.*, a dog sniff for drugs] 'compromises no legitimate privacy interest,'" 543 U.S. at 408 (citation omitted), making it "sui generis." <u>Id</u>. at 409 (citing <u>Place</u>, 462 U.S. at 707). But in <u>Florida v. Jardines</u>, 569 U.S. 1 (2013), it chose not to rely on that broad language and instead ruled that a dog sniff at the door of a house is a search, using property law principles.

In the absence of probable cause, circuit court cases seem to limit the scope of a permissible dog sniff to a vehicle's exterior. They allow it to expand to the car's interior only when the dog instinctively jumps in without the handler's facilitation. <u>United States v. Guidry</u>, 817 F.3d 997 (7th Cir. 2016); <u>United States</u>

---

[6] All the Supreme Court's Fourth Amendment cases that I have been able to find involving drug-sniffing dogs and cars were vehicle exterior sniffs. <u>See, e.g.</u>, <u>Rodriguez v. United States</u>, 135 S. Ct. 1609 (2015); <u>Florida v. Harris</u>, 568 U.S. 237 (2013); <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32 (2000). The Court has also addressed sniffs of luggage, <u>United States v. Place</u>, 462 U.S. 696 (1989), and sniffs within the curtilage of a home, <u>Florida v. Jardines</u>, 569 U.S. 1 (2013), but, as noted above, has not decided a challenge to a sniff of a person.

v. Moore, 795 F.3d 1224 (10th Cir. 2015); United States v. Sharp, 689 F.3d 616 (6th Cir. 2012); United States v. Pierce, 622 F.3d 209 (3d Cir. 2010); United States v. Vazquez, 555 F.3d 923 (10th Cir. 2009); United States v. Lyons, 486 F.3d 367 (8th Cir. 2007).[7] The First Circuit has not spoken on the subject. In United States v. Esquilin, 208 F.3d 315 (1st Cir. 2000), abrogated on other grounds by Missouri v. Seibert, 542 U.S. 600 (2004), it did say that "the important factor in applying *Place* [on the question whether a search occurred] is not whether the sniff occurs in a public place like an airport, but whether—as in an officer's 'plain view' observation of contraband—'the observing person or the sniffing canine are legally present at their vantage when their respective senses are aroused by obviously incriminating evidence.'" Id. at 318 (citation omitted). The sniff of Artis and Merritt did occur on a public roadside where the dog was legally present, but the defendants did not consent to the sniff and they had been forcibly extricated from the vehicle. In Esquilin, the defendant had "voluntarily consented to the presence of [the dog] and the officers in his motel room." Id. As a result, Esquilin concluded that the resulting sniff did not amount to a search. Id. But in Esquilin, there was no suggestion that the dog was directed to and alerted on the defendant; instead after the defendant consented, the dog proceeded to a GAP bag and pulled drugs out of it. Id. at 317.[8]

---

[7] They all distinguish United States v. Winningham, 140 F.3d 1328 (10th Cir. 1998), on this basis. The Tenth Circuit in Winningham held that a dog sniff of a car's interior facilitated by law enforcement implicates the Fourth Amendment. See generally 1 LaFave, Search & Seizure § 2.2(g) n.413 and accompanying text (5th ed.).

[8] Before the defendant consented to the search, he consented to letting the dog and the officers enter his motel room, whereupon the dog (without being given the command to find drugs) sniffed all the furniture, the bed, a GAP shopping bag, and the defendant himself, who patted her. Id.

7

I confess that I am perplexed on how to apply <u>Caballes</u> and its progeny to what occurred here, an intrusive sniff of the defendants after they had been forcibly extricated from the car. In addition, I do not know what to make of the <u>Caballes</u> language that a dog sniff that only can reveal contraband does not compromise a legitimate privacy interest and whether that applies to the human body as occurred here, as well as to a car's exterior as in <u>Caballes</u>.[9]

In response to the defendants' argument that the nature of the stop and takedown of the defendants amounted to a de facto arrest, not a <u>Terry</u> stop, the government has now argued that probable cause for an arrest existed at the time of the stop. If, as the government argues, there was probable cause to arrest at the time of the stop, then law enforcement was entitled to search the defendants—including the intrusive dog sniff—at that time, as a search incident to arrest. <u>Riley v. California</u>, 134 S. Ct. 2473 (2014); <u>Gustafson v. Florida</u>, 414 U.S. 260 (1973); <u>United States v. Robinson, 414 U.S. 218</u> (1973); <u>Sibron v. New York</u>, 392 U.S. 40, 66-68 (1968). When the formal arrest "followed quickly," as it did here, the fact that the search occurred first is not particularly important if law enforcement had probable cause for an arrest at the time of the search. <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 110-11 (1980); <u>see also</u> 3 Search & Seizure § 5.4(a) text accompanying nn.7-11.50. If there was probable cause for an arrest, that would moot the question whether police conduct in the take-down itself

---

[9] There are pre-<u>Caballes</u> Fifth Circuit cases that seem to say that a dog making physical contact with a person being sniffed does amount to a search. <u>E.g.</u>, <u>United States v. Reyes</u>, 349 F.3d 219, 223-24 (5th Cir. 2003); <u>United States v. Kelly</u>, 302 F.3d 291, 293 n.1 (5th Cir. 2002); <u>Horton v. Goose Creek Indep. Sch. Dist.</u>, 690 F.2d 470, 479 (5th Cir. 1982); and one Ninth Circuit case that says "close proximity sniffing" of a person rather than an object does amount to a search. <u>B.C. v. Plumas Unified Sch. Dist.</u>, 192 F.3d 1260, 1266 (9th Cir. 1999). <u>But see</u> <u>Doe v. Renfrow</u>, 631 F.2d 91 (7th Cir. 1980). <u>Horton</u>, <u>B.C.</u>, and <u>Doe</u> all involved school students being sniffed.

amounted to a de facto arrest and it would also moot the question whether the Supreme Court's dog sniff cases and this Circuit's motel room sniff case make the dog sniffs of the defendants here searches or not.[10]

I turn therefore to whether law enforcement had probable cause to arrest these two defendants for drug trafficking when they pulled over the car at Exit 75. To summarize my previous recitation of what happened May 12 and during the early morning hours of May 13:

Madore had been using CI1 as an informant since February; CI1's information had been corroborated and had led to arrests. CI1 was paid when he gave Madore useful information.

CI1 called Madore May 12 to tell him that an out-of-state crack dealer called him asking for a ride at 7:30 pm that evening from Boston South Station to Lewiston to bring crack to sell and that the caller said he would pay for the ride in drugs. CI1 told Madore he thought the caller might be Mayo, who was known to both Madore and CI1, but that he wasn't sure. There was subsequent communication that day between CI1 and Madore by phone, texts, and one in-person meeting.

Madore asked CI1 to agree to the request for a ride and Madore arranged for CI2 to drive because CI1 had no valid license. The two CIs headed south to Boston around 5:30 pm or 6 pm. CI1 informed Madore by phone or text that the caller had been delayed. Madore gave the CIs the option of returning home or

---

[10] It also moots the question whether, if the takedown was a de facto arrest and the sniffs are not searches requiring probable cause, they provide an "independent source" for admission of the challenged evidence. See United States v. Moore, 329 F.3d 399 (5th Cir. 2003) (alleged de facto arrest was not "but-for" cause of search revealing drugs in car; dog sniff provided independent basis for the search).

9

waiting and they decided to wait. Later, two individuals turned up for the ride at Boston's South Station, and CI1 informed Madore either by phone or text that they were two African American males but not Mayo. CI1 also texted Madore reporting the vehicle's progress as they reached New Hampshire, then Maine, then various mileage markers on the Maine Turnpike. The car turned up at Exit 75 soon after midnight as Madore had expected from CI1's texts.

Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quoting Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983)). It "is not a high bar." Id. (quoting Kaley v. United States, 134 S. Ct. 1090, 1103 (2014)). Officers are entitled to make "reasonable inference[s]," id., and to make "common-sense conclusions about human behavior." Id. at 587. I must consider "the totality of the circumstances." Id. at 586. "A factor viewed in isolation is often more 'readily susceptible to an innocent explanation' than one viewed as part of a totality." Id. at 589 (citation omitted). "[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." Id. at 588. It is an objective standard. Id. at 584 n.2.[11]

Applying these principles, I conclude that Agent Madore had probable cause to arrest the defendants for drug trafficking[12] when he executed the Exit

---

[11] The defendants' race is irrelevant to whether probable cause existed (except insofar as it is a detail provided by CI1 that could be corroborated), and I therefore do not take into account the defense's references to politicians' statements or current events regarding law enforcement treatment of African Americans. Nor does it matter whether Madore subjectively thought he had probable cause (just as it does not matter to the probable cause analysis what another officer thought Madore said about whether he had probable cause, as noted in my bench ruling).

[12] "[A]n arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." Id. (citing Devenpeck v. Alford, 543 U.S. 146, 153-55 & n.2 (2004)).

75 vehicle stop. A reliable informant who himself had previous drug involvement told Madore that a crack dealer wanted transportation from Boston South Station to Lewiston to sell crack and that the dealer would provide crack in exchange for the ride. Madore proceeded to direct two informants to provide the ride. The informants got paid for good information. They informed Madore that the caller had been delayed and they elected to stay until his later arrival. Two people showed up, and the car with the four occupants headed north toward Lewiston, with CI1 keeping Madore posted on its progress. It would be common sense to believe that someone who turned up for a ride at South Station after calling to ask for a ride from South Station to Lewiston to sell drugs and promising drugs to the person providing the transportation was in fact carrying drugs with him. The presence of two males rather than one does not alter that conclusion. No innocent explanation is apparent for a companion when one male had asked for a ride to Lewiston to sell crack and offered crack in exchange. The fact that the information came from CI1 does not taint the probable cause; Madore knew him to be a reliable informant; Madore arranged the trip; CI1 had an incentive to be truthful because he got paid for good information; there was nothing for him to gain by prevaricating. The fact that Mayo did not appear at South Station does not change the analysis; CI1 had told Madore at the outset that he was not certain that the caller was Mayo. In short, there was probable cause to stop the car and arrest the defendants. I therefore do not decide whether the manner of extracting the defendants from the car turned a <u>Terry</u> stop into a de facto arrest.

Because there was probable cause for the arrests, a search of the defendants incident to their arrests was permitted under the Supreme Court precedents I named earlier. That includes the dog sniff. I therefore do not decide whether, under Supreme Court and circuit court precedents, the dog sniff would be permitted without probable cause for arrest.

As I said in my earlier bench ruling, the subsequent strip search of Merritt at the jail was permissible under <u>Florence v. Board of Chosen Freeholders of Cty. of Burlington</u>, 566 U.S. 318 (2012). There is therefore no basis to suppress the observation of a plastic baggie protruding from Merritt's rectum at that time. Whether the plastic baggie of crack that the ambulance attendant recovered later at the hospital entrance is the same baggie that Merritt had in his rectum is a question for the jury, not relevant to the suppression ruling.

For all these reasons, the defendants' motions to suppress are **DENIED**.

**SO ORDERED.**

**DATED THIS 19TH DAY OF JUNE, 2018**

<u>/S/D. BROCK HORNBY</u>
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**